IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                No.  CR 01-695 MV

JASON PAUL NOWICKI,

        Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant's Motion for Downward Departure, filed September 12, 2002 **[Doc. No. 48]**.  The Court, having considered the motion, briefs, relevant law and being otherwise fully informed, ruled at the sentencing hearing that the motion would be **GRANTED**.  The Court now sets forth the bases for its prior ruling in this Memorandum Opinion.

## BACKGROUND

According to the Presentence Report ("PSR") prepared by the United States Probation Office, Defendant's biological mother was fifteen years old when she became pregnant, and was a heroin user during the first trimester of her pregnancy.  She was also involved in a motorcycle accident in her second trimester, and remained hospitalized until she gave birth.  Defendant's biological father had what was described as a "criminal past."

When he was an infant between the ages of one and two, Defendant was adopted by Stella and Paul Nowicki.  Defendant's adoptive parents separated when he was approximately four years old.  When Defendant was between the ages of five and seven years old, he spent a period of time living with his adoptive father (hereinafter referred to as Defendant's "father"), an unrecovered alcoholic.  During this period, Mrs. Nowicki went to another city to care for her sister, who was

having a difficult pregnancy.  As more fully set forth below, Defendant suffered extreme physical and emotional abuse at the hands of his father during this period and likely before the Nowickis' separation.

Defendant lived with his mother from the time he was approximately seven years old until he was fourteen years old.  When he was fourteen years old, Defendant stole a car from a car dealership. At his mother's request, the Texas juvenile authorities placed Defendant in a juvenile facility. Defendant was committed to the Texas Youth Commission ("TYC") for a period not to exceed his twenty-first birthday.  Defendant was not finally released from juvenile custody until he was twenty years old, six years after his initial commitment.

During his commitment, Defendant was placed at various correctional facilities.  While at these facilities and on parole, he accumulated 114 different incidences and arrests for which he had informal or revocation hearings, which included running away, assaulting staff, assaulting other juveniles in custody, theft of staff vehicles, arson, burglary and theft of cars, possession of firearm, use of drugs, and disruption of program.  According to Defendant, these incidents and arrests arose out of the fact that he was in a situation of great danger from much older juveniles at the facility -- Defendant saw what they did to each other and determined that he had no choice but to assert himself physically and fight in order to stay alive.  As a result of his fighting, Defendant spent a great deal of time in solitary confinement.  In the approximately four years that Defendant was in juvenile custody, his mother visited him no more than four or five times.

Defendant was paroled to New Mexico to live with his mother on March 25, 1998, but he was rearrested on April 24, 1998 for car theft and returned to Texas for a parole violation on June 29, 1998.  He was allowed to return to New Mexico on September 4, 1998, but he became an absconder

with TYC, as he never reported to authorities in New Mexico.  He was subsequently arrested on May 20, 1999 and charged with armed robbery.  Defendant pled guilty to the charge on December 12, 1999.  As a result of his conviction and sentence in the armed robbery case, Defendant was unsatisfactorily discharged from TYC on July 25, 2000.  At that time, he was twenty years old.

On March 9, 2000, subsequent to his state court conviction for armed robbery, Defendant attempted to purchase a firearm from a gun shop in Rio Rancho, New Mexico.  Defendant filled out a firearms transaction form, using the name of "Joshua Ramon Myers."  On May 4, 2001, a Criminal Complaint **[Doc. No. 1]** was filed charging Defendant with Felon in Possession of a Firearm. Defendant was arrested.  A one-count Indictment **[Doc. No. 8]** was filed charging Defendant as in the Criminal Complaint.  Defendant entered a plea of not guilty to the Indictment.  On May 22, 2002, Defendant pled guilty to a one-count Information **[Doc. No. 39]** charging him with False Statement in Connection with Acquisition of a Firearm.  At the time, Defendant was twenty-two years old.

On September 12, 2002, after reviewing the PSR, Defendant filed his Motion for Downward Departure **[Doc. No. 48]**, in which he asked the Court to depart downward from the sentencing guidelines on the basis of a combination of the following factors: mental and emotional conditions/abusive childhood; diminished capacity; post-offense rehabilitation; and over-representation of criminal history.  On September 20, 2002, the Government filed an Opposition to Defendant's Motion for Downward Departure **[Doc. No. 52]**.  Subsequently, on September 17, 2002, Defendant filed an Attachment and Corrections to Defendant's Motion for Downward Departure **[Doc. No. 50]**.

The Court commenced a sentencing hearing on October 24, 2002, but vacated the hearing and ordered that Dr. Anne Rose, Ph.D. prepare a psychological evaluation of Defendant.  On January 29,

2003, the Court held an evidentiary hearing which addressed the issues raised by Defendant in his Motion.  At the completion of the hearing, as set forth below, the Court granted a five-level downward departure based upon a combination of factors, reducing Defendant's offense level from seventeen (17) to twelve (12).  In addition, as set forth below, the Court reduced Defendant's criminal history category from a Category IV to a Category III.

## DISCUSSION

Downward Departure

Section 5K2.0 of the United States Sentencing Guidelines (the "Guidelines") provides the Court with the discretion to depart from the applicable sentencing range if "'there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.'" U.S.S.G. §5K2.0 (quoting 18 U.S.C. §3553(b)).  "Although a discouraged factor, standing alone, may be an insufficient basis for a §5K2.0 departure, several such factors, in combination, may allow a judge to depart under §5K2.0 if they are present to an exceptional degree or in some other way make the case different from the ordinary case in which such factors are present."  *United States v. Martinez*, 978 F. Supp. 1442, 1451 (D.N.M. 1997).  In the instant case, Defendant argued that a downward departure from the sentencing guidelines is warranted pursuant to Section 5K2.0 based upon several factors, each of which is addressed in turn below.  After consideration of the evidence, the Court concluded that there are several factors which ordinarily might not be relevant in determining whether a sentence should be outside the guideline range, but are present in this case to an exceptional degree and, in combination, remove this case from the heartland of cases.

Mental and Emotional Conditions/Childhood Abuse

Section 5H1.3 of the Guidelines provides that "[m]ental and emotional conditions are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range, except as provided in Chapter Five, Part K, Subpart 2 (Other Grounds for Departure)."  A sentencing court may consider mental and emotional conditions if such conditions are "present to an unusual degree and distinguish[] the case from the 'heartland' cases covered by the guidelines in a way that is important to the purposes of sentencing."  *United States v. Jones*, 158 F.3d 492, 499 (10th Cir. 1998) (citing U.S.S.G. §5K2.0).

"The guidelines do not specifically address the issue of childhood abuse."  *United States v. Roe*, 976 F.2d 1216, 1217 (9th Cir. 1992).  Several circuits, however, have held that Section 5H1.3 allows for a downward departure "in cases of extreme childhood abuse."  *United States v. Rivera*, 192 F.3d 81, 84 (2d Cir. 1999), *cert. denied sub nom.*, *Mendez v. United States*, 528 U.S. 1129 (2000) (citing *United States v. Pullen*, 89 F.3d 368, 372 (7th Cir. 1996), *cert. denied*, 519 U.S. 1066 (1997); *United States v. Clark*, 8 F.3d 839, 845-46 (D.C. Cir. 1993); *United States v. Roe*, 976 F.2d 1216, 1218 (9th Cir. 1992); *United States v. Vela*, 927 F.2d 197, 199 (5th Cir.), *cert. denied*, 502 U.S. 875 (1991); *United States v. Deigert*, 916 F.2d 916, 919 (4th Cir. 1990)).

In *Roe*, the Ninth Circuit held that, because "the Sentencing Commission expressly considered the impact of [mental and emotional] conditions in formulating section 5H1.3, . . . the psychological effects of childhood abuse may only be considered as a basis for departure in extraordinary circumstances."  976 F.2d at 1218.  Applying that standard, the Ninth Circuit found that the district court had abused its discretion for failing to depart where the defendant's abusive upbringing included

-5-

living with a drug-addicted mother and her boyfriend, who subjected the defendant to "routine" and "savage" sexual and physical abuse and degradation.

In *Rivera*, the Second Circuit stated that, "[i]t seems beyond question that abuse suffered during childhood – at some level of severity – can impair a person's mental and emotional conditions."  192 F.3d at 85.  Accordingly, the Second Circuit concluded, "in extraordinary circumstances (the parameters of which we leave to future development), district courts may properly grant a downward departure on the ground that extreme childhood abuse caused mental and emotional conditions that contributed to the defendant's commission of the offense."  *Id.*  Moreover, several courts have held that a downward departure based upon extreme childhood abuse is not foreclosed by Section 5H1.12 of the Guidelines.  Section 5H1.12 states that "lack of guidance as a youth and similar circumstances indicating a disadvantaged upbringing are not relevant grounds for imposing a sentence outside the applicable guideline range."  In *Pullen*, the Seventh Circuit observed that "the 'similar circumstances' to which Section 5H1.12 refers might not be thought to encompass childhood sexual abuse by a parent, which is not all that similar to the sort of parental neglect, rather than abuse, conjured up by the term 'lack of guidance.'" 89 F.3d at 371.  Similarly, in *United States v. Ayers*, 971 F. Supp. 1197 (N.D. Ill. 1997), the court found that the "'similar circumstances' to which Section 5H1.12 refers do not encompass the extreme psychological and physical abuse which Ayers suffered as a child.  Therefore, Section 5H1.12 of the Guidelines does not preclude a downward departure in this case."  *Id.* at 1200.

In *United States v. Browning*, 252 F.3d 1153 (10th Cir. 2001), the Tenth Circuit was confronted with the issue of whether the sentencing court erred in declining to grant a downward departure based upon childhood abuse.  The Tenth Circuit first explained that, as a general matter,

Section 5H1.12 prohibits departures for lack of guidance as a youth and similar circumstances indicating a disadvantaged upbringing. The Tenth Circuit then cited *Ayers* and *Rivera*, and stated that *Ayers* "persuasively distinguishes 'exceptionally cruel . . . psychological and emotional abuse' constituting 'a form of sadistic torture' from the generalized lack of guidance or neglect that §5H1.12 prohibits as a basis for departure." *Id.* at 1160. The Tenth Circuit, however, found that it did not have jurisdiction to review the sentencing court's refusal to grant a downward departure, as the sentencing court did not state that it did not have the authority to depart. The Tenth Circuit specifically noted, however, "the analytical soundness of *Ayers, Rivera,* and similar cases." *Id.*

Thus, while the Tenth Circuit did not have the occasion to rule on whether childhood abuse is an appropriate ground for departure, it specifically discussed and cited favorably cases in other circuits which have ruled that childhood abuse is an appropriate ground for departure. *Browning* thus leaves this Court with full discretion to consider childhood abuse as a ground for departure. In light of the *dicta* in *Browning*, this Court will look to the standards set forth in *Ayers* and *Rivera* to determine whether the evidence of childhood abuse presented herein warrants a downward departure.

In the instant case, Mrs. Nowicki's testimony, psychological reports, Dr. Rose's testimony and Defendant's own statements corroborate a history of extreme physical and emotional abuse of Defendant at the hands of his father. The Court notes the following specific incidents of abuse.

On one occasion, Defendant's father violently rammed the Defendant's head through a sheetrock wall. Defendant's body was in one room, and his head was in another room. Mrs. Nowicki testified that Defendant reported this incident to her, and that when she confronted her husband about it, he admitted that he had done it. On another occasion, when Defendant dropped a french fry with

ketchup onto the rug, his father backhanded him so hard that he knocked Defendant backwards, completely out of his chair.

While Defendant was in his care, Defendant's father frequently used duct tape to restrain him in a chair and cover his mouth. Defendant's father then would leave his child alone in the house, with no way to call or run for help, while he went out to bars to get drunk. Mrs. Nowicki testified that, after she returned home from staying with her sister, her neighbors reported to her that Defendant's father routinely picked up his son from school, brought him home, put him in his room, taped up the windows and doors so that he could not get out, and left him alone in the house for hours. The neighbors often rescued Defendant, letting him out of his room until just before Defendant's father was due to return home, when they would tape everything back up again. Mrs. Nowicki also testified that Defendant himself similarly reported to her that his father taped him up in his room, leaving him for hours alone in the house.

Another form of discipline that Defendant's father regularly used was to put bottle caps on the floor and make Defendant kneel in the corner, facing the wall, with his knees on the sharp bottle caps. He then would lean over and yell in his son's ears what a bad person he was. Mrs. Nowicki testified that her sister reported to her that, on one occasion, when she was visiting the Nowickis' home, Defendant told her about this. Her sister told Mrs. Nowicki that, although at first she did not believe Defendant, she actually saw the bottle caps in the corner. Mrs. Nowicki further testified that, on one occasion prior to her separation from Defendant's father, her sister told her that she had just seen Defendant's father kick Defendant. At the time, Defendant was standing in the corner, where Defendant's father had put him as a punishment for misbehaving.

Mrs. Nowicki testified that, when she returned home unannounced from staying with her sister, she could hear Defendant's father screaming at Defendant as she walked up to the door. The door was unlocked and she let herself in. Upon opening the door, she found Defendant crouched in a corner, shivering and frightened, while Defendant's father was standing over him and screaming "horrible things" at him.

At the hearing, Defendant told the Court of one instance in which his father put his face into a mattress until he could not breathe. He also talked about how his father would keep him out of school so that no one would see the bruises that he had inflicted upon his child's face and ask questions about how he had gotten the bruises. Defendant explained that he has been caught in a cycle of violence: he learned from his father that you beat someone up because you can. Applying this lesson, he ended up in a juvenile facility, where he developed "the mentality of being locked up," where you "don't let anybody mess with you." Defendant then talked about having been shot before, and how the lessons in violence that he learned both in his home and in the juvenile facility led him to believe that the only way to protect himself was to get a gun.

Seven psychological evaluations of Defendant were conducted over a period of four years while Defendant was in juvenile custody. These evaluations report an incident in which Defendant was hit in the head by his father and knocked unconscious. In addition, these evaluations corroborate the incident in which Defendant's father rammed his head through a sheetrock wall. Evaluations further indicate that Defendant's parents hit him in anger over the years as he was growing up, and detail that he ran away from home because he was tired of being beaten by his father.

Defendant was diagnosed with a conduct disorder in 1994. A 1996 evaluation demonstrates that, while he was in juvenile custody, Defendant was prescribed lithium carbonate to help "control

his explosiveness."  Similarly, November 2001 records from the Torrance County Detention Center establish that, while he was in custody, Defendant was diagnosed with bipolar affective disorder and prescribed lithium and thorazine.  Finally, psychological testing of Defendant reveals that he has unresolved anger, a sense of being damaged, and a view of the world as dangerous.

Dr. Rose conducted a psychological evaluation of Defendant on November 11 and 15, 2002. In her report, Dr. Rose finds that Defendant "tests as being liable to manic episodes, such as can be found in people who suffer from bipolar disorder." Evaluation Report of Dr. Anne Rose, Ph.D. at 3. Dr. Rose further finds that Defendant's childhood "was a stressful one, with both physical and emotional abuse from his father, a violent alcoholic, and lack of protection from his mother." *Id.* at 2.  Finally, Dr. Rose finds that Defendant's "high level of intellect is especially notable given his reported early history of head injury, which can often lead to cognitive impairment." *Id.* at 4.

At the sentencing hearing, Dr. Rose testified that Defendant has a serious mood disorder, most likely bipolar disorder or manic depression, which is manifested with extreme mood swings, inability to focus, and depression that can be so severe that it creates an inability to function.  Further, Dr. Rose testified that Defendant's "severe history of physical abuse at the hands of his father and others" has formed his perception of the world and the way in which he has reacted to the world. Specifically, Dr. Rose testified that you learn what you live with, and Defendant learned, as a very young child, that the world was a dangerous place.  He was small, and had to learn to defend himself. According to Dr. Rose, Defendant's early experience of abuse impacted him very strongly, because "what we learn when we are very little has a whole lot more effect on us than what we learn later in life."  Finally, Dr. Rose testified that Defendant has worked very hard to overcome his early years of abuse, and to relearn how to react to the world without violence.

-10-

The violence described at the hands of his father, as well as the violence that he saw and that surrounded him while in custody as a child, in combination with his bipolar disorder, caused Defendant to distrust the world, and to fear it.   The abuse is consistently described in the psychological evaluations performed on Defendant, all of which this Court has reviewed.[1]   In her testimony, Mrs. Nowicki was truly remorseful that she did not protect her son from his father and admitted that she used marijuana during his youth.  The Court finds her testimony to be very credible. Defendant's own statements to the Court were not only poignant, but also very credible.  He did not try to overstate his suffering at the hands of his father, but instead wanted to focus on his accomplishments, on the goals toward which he is working, and on the role that his religion and his daughter provide to him at the present time.  His statements are consistent with the reports from Defendant's Pretrial Services Officer, who has indicated that Defendant has performed well, and that she is optimistic about his ability to succeed in the future.

It is difficult to evaluate whether a child's experience of physical and emotional abuse is outside of the heartland.  To evaluate violence against a child, and to judge whether it is severe enough to be extraordinary, is not a task that any judge takes lightly.  No child should have to endure the abuse that Defendant endured.  That, however, is not the controlling legal standard. The Court

---

[1]In all of the reports this Court has read, there were only two instances in which Defendant reported that both parents, rather than his father only, abused him.  Defendant has never attributed violence to his mother, and has never recounted any specific instances of violence at her hands.  Mrs. Nowicki testified that she did spank her son, and admitted that she did not protect him, but denies ever having physically abused him.  She described Defendant as a very angry child, and explained that he was angry with her for not believing him when he told her about his father's abuse.  Thus, the Court concludes that when Defendant reported abuse by his mother, which reports date back to his first period of incarceration as a fourteen year old child, it is quite possible that he meant that he felt neglected and unprotected by his mother.

must evaluate whether this abuse, as described by witnesses and in the psychological reports, is severe enough to constitute extraordinary abuse that would take this case outside of the heartland.

One way to undertake such an evaluation is to compare the abuse suffered by Defendant to the conduct that is considered so serious as to merit criminal prosecution. The Court believes that allegations of these instances of abuse undoubtedly would result in criminal prosecutions. Another way to evaluate the severity of the abuse is to consider the context in which the abuse occurred. Perhaps if the abuse happened only once or twice during the lifetime of the child, or during very trying times in the lives of the parents, the conduct, while not excusable, might be more understandable, and pose less of a threat to the child. Unfortunately, this was not the case here. There are too many serious reports of abuse of Defendant which, if occurred today, neighbors and schools would be mandated to report.

In the Court's estimation, each incident of abuse is serious, but possibly would not be enough to make this case extraordinary, with the exception of the instance in which Defendant's head was rammed through a sheetrock wall. In combination, however, the Court is certain that the extent of the violence, the fact that Defendant was so young at the time he suffered the abuse, and the fact that Defendant lacked both a place to go for refuge and the protection of another parent, resulted in Defendant suffering unspeakable violence that left him with life-long scars.

Based upon the foregoing, the Court finds that Defendant suffered extreme childhood abuse, and that this abuse caused mental and emotional conditions that contributed to his commission of the instant offense. *See Rivera*, 192 F.3d at 85. The abuse of Defendant by his father had a serious psychological effect on him, and caused him to believe that he must take extraordinary measures to protect himself from the world around him. Accordingly, his fear motivated him in this case to try

and acquire a firearm to protect himself.  The Court notes that Defendant in fact did not acquire the firearm.

The Court further finds that Section 5H1.12 of the Guidelines, which precludes a downward departure based upon lack of guidance as a youth and similar circumstances indicating a disadvantaged upbringing, does "not encompass the extreme psychological and physical abuse" which Defendant suffered as a child, both with his parents and in the juvenile facility.  *Ayers*, 971 F. Supp. at 1200.  The term "lack of guidance" suggests parents who are absent, inattentive, uneducated, underprivileged or otherwise unable or unwilling to provide a nurturing home environment for their children.  The term "disadvantaged upbringing" implies children who do not enjoy the same socio-economic advantages or privileges as do children in other families.  These terms thus describe childhood experiences vastly different from Defendant's experiences.  In his own home, Defendant was not merely neglected, but affirmatively and cruelly abused.  In the juvenile facility, he constantly faced physical threats by other juveniles in custody, some several years older than he was.  To say that Defendant lacked guidance or was disadvantaged as a youth would not even begin to scratch the surface of the abuse he suffered as a child.  Accordingly, Section 5H1.12 of the Guidelines does not preclude a downward departure in this case.  *See Id.*

Diminished Capacity

Section 5K2.13 of the Guidelines provides the following policy statement:

A sentence below the applicable guideline range may be warranted if the defendant committed the offense while suffering from a significantly reduced mental capacity. However, the court may not depart below the applicable guideline range if (1) the significantly reduced mental capacity was caused by the voluntary use of drugs or other intoxicants; (2) the facts and circumstances of the defendant's offense indicate a need to protect the public because the offense involved actual violence or a serious threat of violence; or (3) the defendant's criminal history indicates a need to incarcerate the defendant to protect the public.  If a departure is warranted, the extent

of the departure should reflect the extent to which the reduced mental capacity contributed to the commission of the offense.

Application Note 1 to Section 5K2.13 provides that, for purposes of this policy statement, "'significantly reduced mental capacity' means the defendant, although convicted, has a significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrongful."

Diminished capacity is an "encouraged" factor – a specific factor provided by the Commission "'to aid the court by identifying some of the factors that the Commission has not been able to take into account fully in formulating the guidelines.'" *United States v. Neal*, 249 F.3d 1251, 1256 (10th Cir. 2001) (citing U.S.S.G. § 5K2.0). In the case of an encouraged factor, "the court is authorized to depart if the applicable Guideline does not already take it into account." *Id.*

The PSR and the evidence before the Court reveal that Defendant has had psychological problems since he was very young. At an early age, Defendant was misdiagnosed with attention deficit disorder, and was improperly prescribed ritalin. In 1994, Defendant was diagnosed with a conduct disorder. In 1996, the juvenile facility began prescribing Defendant lithium carbonate. In 1998, Defendant was diagnosed with post-traumatic stress disorder resulting from a drive-by shooting in which he was a victim. Testing for that evaluation suggested that Defendant has unresolved anger, a sense of being damaged and a view of the world as dangerous. In November 2001, Defendant was diagnosed with bipolar affective disorder and was prescribed lithium and thorazine. As discussed above, Dr. Rose has confirmed that Defendant suffers from a severe mood disorder, most likely bipolar disorder, or manic depression.

The Court finds that the abuse Defendant suffered, his experience of growing up in a juvenile facility, his misdiagnosis with attention deficit disorder and subsequent prescription for ritalin, and

his post-traumatic stress and bipolar disorders, in combination, have affected Defendant in a way analogous to one who suffers from diminished mental capacity.  Defendant's perception of the world, created by his childhood experiences, impaired his ability to understand the wrongfulness of his offense behavior or to exercise the power of reason, or impaired his ability to control behavior that he knew was wrongful.

The Court does not find that a downward departure for diminished capacity is precluded for any reason.  First, Defendant's diminished capacity was not caused by the voluntary use of drugs.  Second, his offense of False Statement in Connection with Acquisition of a Firearm did not involve actual violence or a serious threat of violence.  Although a firearm is potentially used for violent activities, the elements of the instant offense do not include violence or a threat of violence.  The only evidence of a threat of violence comes from the police report filed in connection with Defendant's arrest, which states that Defendant's mother called the Rio Rancho Police Department and informed them that her son intended to buy a gun to kill his ex-girlfriend. Mrs. Nowicki, however, clearly testified that she did not communicate to the police that she believed her son was going to kill his girlfriend, and that she did not feel that this was the case.  Rather, she called the police in order to find out if her son had been arrested and was in custody, and if he did in fact have a gun, as his girlfriend had informed her.  Mrs. Nowicki testified that she never felt that Defendant would try to kill somebody and that she was not concerned that he would try to kill his girlfriend.  Instead, she was concerned that he would do something to hurt himself.  The Court finds Mrs. Nowicki's testimony credible, and therefore finds that the instant offense did not involve a serious threat of violence. Finally, Defendant's criminal history does not indicate the need to incarcerate him in order to protect

the public.  Accordingly, a sentence below the applicable guideline range based upon Defendant's diminished capacity is warranted.

Post-Arrest Rehabilitation

The Court has the authority to consider post-offense rehabilitation as a basis for downward departure.  *See United States v. Jones*, 158 F.3d 492, 503 (10th Cir. 1998) (citing *Koon v. United States*, 518 U.S. 81, 94-96 (1996)).  The Sentencing Guidelines, however, have taken post-offense rehabilitation efforts into consideration: one of the appropriate considerations in determining whether a defendant qualifies for the acceptance of responsibility adjustment is post-offense rehabilitation (U.S.S.G. §3E1.1).  *See Id.*  When an encouraged factor has been taken into consideration by the Guidelines, it may serve as the basis for departure only when present to an "exceptional degree."  *See Id.*  The fact-based assessment of whether a defendant's post-offense rehabilitation efforts are exceptional "falls squarely within the realm of the district court's 'special competence.'"  *Id.*  Thus, a defendant is not entitled to a downward departure based upon post-offense rehabilitation efforts unless such efforts are so exceptional as to go beyond that contemplated by the acceptance of responsibility provision of the Guidelines.  *See United States v. Benally*, 215 F.3d 1068, 1075-76 (10th Cir. 2000).

The Court does not believe that Defendant's post-arrest rehabilitation efforts are so exceptional as to justify a downward departure.  Nonetheless, the Court notes the importance of viewing Defendant's compliance with his conditions of pretrial release in the context of his psychological background.  After hearing testimony and reviewing the evidence, the Court is better able to understand why Defendant had difficulty focusing and contacting his Pretrial Services Officer as often as he was required.  During the period of his release from March 14, 2002 to the present,

Defendant has been required to report to his Pretrial Services Officer every single day.  Defendant

failed to call in or appear for drug testing seven times during this period.  Dr. Rose put this into

context by noting that Defendant's violation rate was a mere two percent.  Dr. Rose also testified

that, given Defendant's mood disorder, she was "absolutely amazed" that Defendant did not fail to

call in more often, and that it is a possibility that his violations were a result of distractions caused by

his mood swings.  The Court notes that, during his period of release, Defendant was working full-

time.  The Court received a letter from Defendant's employer, who reports that Defendant has

important management skills, that he has been supervising a number of other employees, that he

comes to work on time, and that he has been an asset to his company.  It appears that Defendant

made amazing improvements and progress at his job.  It was a first for him, and seems to have given

him the self-confidence he needed to be able to put into action the commitment he has made to his

infant daughter and his religion.  Accordingly, this Court notes that Defendant's post-rehabilitation

efforts, while not sufficient to remove Defendant from the heartland, certainly were impressive.

<u>Over-Representation of Criminal History</u>

Under Section 4A1.3 of the Guidelines, a court may depart downward if a defendant's

criminal history category significantly over-represents the seriousness of the defendant's criminal

history or the likelihood of recidivism and future criminal behavior.  In *United States v.*

*Maldonado-Campos*, 920 F.2d 714 (10th Cir.1990), the Tenth Circuit set forth a three-part test for

evaluation of downward departures from the sentencing guidelines:

> Downward departures based upon criminal history are . . . reviewed under the same
> three-part test for evaluating upward departures . . . .  We first determine *de novo*
> whether the circumstances admit of a factor not adequately taken into account by the
> Sentencing Commission which would justify departure.  Next, we review the district
> court's factual determinations supporting departure under the clearly erroneous
> standard.  Finally, . . . we determine whether the degree of departure was reasonable.

*Id.* at 719-720 (citations and footnotes omitted).  Section 4A1.3 provides that, "[i]f reliable information indicates that the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes, the court may consider imposing a sentence departing from the otherwise applicable guideline range."  Further, Section 4A1.3 states:

> There may be cases where the court concludes that a defendant's criminal history category significantly over-represents the seriousness of a defendant's criminal history or the likelihood that the defendant will commit further crimes.  An example might include the case of a defendant with two minor misdemeanor convictions close to ten years prior to the instant offense and no other evidence of prior criminal behavior in the intervening period.  The court may conclude that the defendant's criminal history was significantly less serious than that of most defendants in the same criminal history category (Category II), and therefore consider a downward departure from the guidelines.

The PSR calculates Defendant's criminal history to be a category IV.  The Court finds that Defendant's criminal history is over-represented, and that his criminal history more closely resembles a category III.  Defendant's criminal record includes a juvenile conviction for burglary of a vehicle when he was just fourteen years old.  Defendant was assessed two criminal history points for this juvenile offense.  In addition, Defendant has an armed robbery conviction, for which he was assessed three points, and a conviction for possession of cocaine, for which he was assessed one point.  He was assessed an additional two points for committing the instant offense while on probation, and one additional point for committing the instant offense within two years of release from custody.

The Court has compared this case with other cases in which the criminal history is more lengthy and is more representative of a criminal history category of IV.  In *United States v. Gonzales*, 01CR624, the defendant had seven convictions relating to aggravated assault, possession of a controlled substance, forgery and burglary, in addition to a number of other convictions.  She also

had a number of arrests which were not counted, either because they were beyond the countable time period or because they had been dismissed.  She had a total of nine points, and her criminal history was category IV.  Similarly, in *United States v. Ziglar*, 01CR410, the defendant had four convictions involving burglaries and one conviction involving attempted aggravated assault.  He had seven criminal history points and a criminal history category of IV.

The Court finds that the criminal record of Defendant herein is less serious than most similarly-situated defendants, and instead is similar to those defendants who have a criminal history category of III.  In addition, although technically accurate, the two points for Defendant's conviction at the age of fourteen should be deducted.  For these reasons, the Court finds that Defendant's criminal history category should be reduced to a category III.

<u>Degree of Departure</u>

In addition to explaining the grounds for a downward departure, the Court must also "specifically articulate reasons for the degree of departure using any *reasonable methodology hitched to the Sentencing Guidelines*, including extrapolation from or analogy to the Guidelines."  *United States v. Goldberg*, 295 F.3d 1133, 1138 (10th Cir. 2002) (citations omitted) (emphasis in original).  In this case, the Court has contemplated the Guidelines' discouragement of using mental and emotional conditions/abusive childhood as a factor to be considered for departure purposes.  However, because the Guidelines state that such a factor is not "ordinarily" relevant, it is logical to presume that the Guidelines foresaw the use of discouraged factors when they are extraordinary.  Furthermore, the Guidelines expressly permit the consideration of encouraged factors, such as diminished capacity, when calculating a defendant's sentence.   Therefore, in exceptional

circumstances such as the case before the Court, the Guidelines clearly contemplate the permissibility of downward departures.

The Guidelines do not, however, specifically delineate the proper method for determining the degree of departure, but rather state that the "decision as to whether and to what extent departure is warranted rests with the sentencing court on a case-specific basis." USSG § 5K2.0 (2001). The Tenth Circuit has required a sentencing court to extrapolate from or analogize to the Guidelines when determining the degree of departure without providing guidance as to how exactly this may be accomplished. *See Goldberg*, 295 F.3d at 1138. Moreover, a sentencing court may not justify a degree of departure "by referring to the resulting sentence rather than to an analogy to the Guidelines." *Id.* at 1140. Therefore, the Court cannot depart a certain number of levels to reach a specific sentence—for example, to avoid incarceration.

While not fully understanding what exactly constitutes a "reasonable methodology hitched to the Sentencing Guidelines," the Court has seriously studied and considered the basic purposes of criminal punishment as articulated by the Guidelines. The Court has weighed the goals of just punishment, deterrence, rehabilitation, and uniformity of sentences against the express contemplation of sentences "outside the range established by the applicable guidelines, if the court finds that there exists [a] . . . mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." USSG § 5K2.0 (quotation marks omitted). Thus, the Court has considered Defendant in comparison with the many other defendants sentenced before the Court, and has determined that a five-level departure will incorporate all of the mitigating factors warranting a sentence below the guideline range, while properly maintaining the integrity of the basic purposes

-20-

of criminal punishment.  Moreover, this departure accurately reflects the extent to which Defendant's mental and emotional conditions and diminished mental capacity contributed to the commission of the offense.  With a five-level departure, Defendant faces a sentence of fifteen (15) months, which the Court believes satisfies sufficiently the goals of punishment, deterrence and the protection of the public.

## CONCLUSION

At the sentencing hearing on January 29, 2003, the Court granted a five-level downward departure based upon a combination of exceptional mitigating factors, including mental and emotional conditions/childhood abuse and diminished capacity, and granted a reduction in Defendant's criminal history category from a category IV to a category III.  With a criminal history category III and an offense level of twelve (12), Defendant faced a guideline range of fifteen (15) to twenty-one (21) months.  The Court imposed a sentence of fifteen (15) months.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Downward Departure **[Doc. No. 48]** is **GRANTED**.


**DATED** this 11th day of March, 2003.

                          _____
                          MARTHA VÁZQUEZ
                          UNITED STATES DISTRICT JUDGE

Attorney for Plaintiff:
Glynette Carson McNabb, Esq.

Attorney for Defendant:
Roger Finzel, Esq.